IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2017

## STATE OF TENNESSEE v. REGINALD BERNARD COFFEE

**Appeal from the Criminal Court for Davidson County**
**No. 2012-D-3081     Seth W. Norman, Judge**

---

### No. M2016-01834-CCA-R3-CD

---

The Defendant, Reginald Bernard Coffee, was convicted by a Davidson County Criminal Court jury of especially aggravated robbery, a Class A felony, and sentenced to fifteen years. *See* T.C.A. § 39-13-403 (2014). On appeal, he contends that (1) the evidence is insufficient to support his conviction and (2) the fingerprint evidence was admitted without a sufficient foundation. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Kevin Kelly (on appeal and at motion for new trial), Michael Freeman (at trial), Nashville, Tennessee, for the appellant, Reginald Bernard Coffee.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn Funk, District Attorney General; and Renee Erb, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case relates to a June 5, 2012 robbery, during which David Johnson was shot in the abdomen. At the trial, Paresh Patel testified that on June 5, 2012, a shooting occurred at the hotel he owned. He said three surveillance cameras were located at the front of the building, and he identified photographs of the hotel and marked the location of one of the cameras. Mr. Patel stated that he lived at the hotel, that the police responded to the shooting, and that he gave them a copy of the surveillance recording. Mr. Patel said that he was told to stay away from the location of the shooting, and he denied that he or an employee picked up money from the parking lot and placed it on an air conditioning unit. He stated that he did not witness the robbery, that he did not know

the victim, and that he did not remember if the victim's truck was in the parking lot when the police arrived.

The surveillance recordings were received as an exhibit and depicted three angles of the incident. The first recording depicted the length of the hotel and the corresponding parking lot. In the recording, which was time stamped June 5, 2012, at 6:02 a.m., a black sedan parked to the right of a pickup truck. The sedan's passenger side faced the camera. A man exited the rear passenger-side door of the sedan and walked to the pickup truck, momentarily reached into the truck bed, and returned to the sedan. The man paused and looked toward the front passenger window before reentering the passenger-side backseat, and the door remained slightly open. The man ran from the sedan and toward the hotel, and a small cloud of dust rose in the parking lot halfway between the sedan and the hotel. The sedan drove in reverse toward the entrance to the parking lot and the direction in which the man ran, and the sedan's rear driver's side door opened.

The second recording depicted the hotel and parking lot from the opposite end of the parking lot. It showed the black sedan's driving backward and the man's running. The rear driver's side door was open and a person's leg was hanging out. The third recording depicted the parking lot as visible from the hotel, and it showed the sedan's driving backward with the rear driver's side door open.

On cross-examination, Mr. Patel testified that on June 5, he heard a gunshot at about 6:00 a.m., walked outside, and saw "that guy . . . on the front of my door." Mr. Patel said that he made a recording on his cell phone of the surveillance recording and later transferred the cell phone recording to a disc. He stated that the police did not have the original surveillance recording and that it had been destroyed.

The forty-six-year-old victim testified that he was shot at the hotel owned by Mr. Patel. He said that he had stayed at the hotel previously and that he was only there for one night. He stated that he was a tattoo artist and trained others, that he "bounced around" and did not have a home, and that before the shooting, he did not have medical problems. He said that a few days before the shooting, he met a woman named Meagan Pursell, that they "hooked up," and that she asked him to come to Nashville to give her a tattoo. He stated that they met at a hotel, that he went to Clarksville the following day, and that he returned to Nashville that night. He said that Ms. Pursell visited him at a second hotel but that she did not stay the night. He stated that their third meeting occurred at Mr. Patel's hotel, that he arrived between 6:00 and 7:00 p.m., and that Ms. Pursell joined him two hours later. He said that they smoked cocaine and marijuana, that he did not generally use cocaine, and that he had been "clean" for years after a previous prison sentence resulting from a drug conviction. He stated that after his release from

prison, he married and had a child, discovered his marriage was invalid, obtained custody of his daughter, and "stayed off of everything but pot."

The victim testified that when Ms. Pursell arrived, she had a "little bit" of cocaine and wanted him to give her money to purchase more. He said that he refused to give her the money, that he wanted to accompany her to buy the cocaine, that he helped her get the cocaine she wanted, and that he used some of the cocaine. He stated that she drove a black, late 1990s Ford Focus with a broken window or passenger's side mirror. He said that he drove a Ford F-150 truck. He stated that they left the hotel in her car, that they returned to wait for someone who never arrived, and that they drove around looking for someone to sell them cocaine. He said that they were unsuccessful and that he left the car at about 1:30 or 2:00 a.m., three or four hours after Ms. Pursell came to the hotel. He stated that he got out of the car because Ms. Pursell wanted to go to a neighborhood in East Nashville and that "I'm a white man and I don't put my life in jeopardy like that at 2:00 . . . in the morning in the projects." He stated that Ms. Pursell insisted on going to the neighborhood and that she tried to "forcibly" take him with her. He said that he "jerked" the steering wheel to get Ms. Pursell to pull over, that he got out of the car on the interstate, and that she drove away. He said that he walked to a market and called a taxi, that a taxi would have taken too long to arrive, and that he decided to walk to a nearby truck stop and get something to eat. He said that he went to the truck stop, got something to drink, and Ms. Pursell called and asked where he was. He noted that Ms. Pursell had called him several times and that he initially ignored her calls.

The victim testified that Ms. Pursell offered to pick him up, that he walked to a nearby gas station, and that when she arrived between 4:30 and 5:00 a.m., she was accompanied by two male passengers whom he did not know. The victim estimated that the gas station was fifteen to twenty minutes from the hotel. He said that he paid for gas, entered the backseat, and sat behind the passenger. The victim stated that he tried to talk to the man in the backseat about his tattoos and the victim's being a tattoo artist but that the man did not talk much. The victim described the man as a "big older man" around age thirty-two or thirty-three who was African-American and had short hair. The victim said that when they arrived at the hotel, Ms. Pursell was supposed to return because she wanted the victim to give her thirty dollars for drugs. He stated that he would keep the money at the hotel and give it to her when she returned, that Ms. Pursell was satisfied with the arrangement, that the victim left and acted like he had to retrieve the money from his truck, and that he reentered Ms. Pursell's car but did not completely close the door. The victim explained that he did not want the men to know he was carrying more than thirty dollars. The victim said that the man in the front seat was supposed to have the drugs and that the victim asked to buy thirty dollars' worth of cocaine from him. The

victim stated that the man, who was young, African-American, slender, and had "[r]eally long braids," pointed a gun at him.

The victim testified that the man in the front seat said, "Give me your d--- money," that the victim threw thirty dollars at the man, and that the man said, "No, I want all of the d--- money." The victim said that he told the man he did not have any more money, that the man said he knew the victim had more, and that the victim reached into his pocket to pull out the rest of his money. The victim stated that as he reached into his pocket, the man shot him, that the victim "hit the door and rolled out running," and that he dropped cash totaling about $260 inside the car and on the ground. The victim said that he did not see the shooter other than "a piece of an eye and his hand" and that he was unable to identify the shooter in a photograph lineup.

The victim testified that after he left the car, he ran to a maintenance worker's room and the hotel office, that he tried unsuccessfully to get help, and that he sat down on a curb and called 9-1-1 from his cell phone. He said that the police and an ambulance arrived quickly.

The victim identified his truck and Ms. Pursell's car in the surveillance recording, his exiting the car and walking to his truck, his reentering the car but not closing the door fully, and his exiting the car. The victim stated that the second time he exited the car, he had been shot and that the events transpired faster than what was depicted in the recording. The victim said that dawn was breaking at the time of the shooting. He identified a leg protruding from the car and stated that it appeared as if the man in the backseat attempted to exit the car. The victim said that the man in the rear seat looked shocked when the man in the front passenger seat pulled out the gun. The victim said that Ms. Pursell told him to give the man his money and that she seemed shocked.

The victim testified that he did not know Ms. Pursell was "setting [him] up" and that he provided her license plate number to the police. He acknowledged that he told the police that he was suspicious of Ms. Pursell and thought she had set him up, although he had no proof. The victim noted that he was presently "not really" suspicious of her because she looked shocked and scared when the shooter pointed the gun at the victim. The victim stated that Ms. Pursell "freaked out" and told him to "just give him the money." The victim said that Ms. Pursell had been "genuinely concerned about" him since the shooting and that when they saw one another, she asked how he was doing and wanted to see his scars.

-4-

The victim testified that he was in the hospital for "a while," although he did not remember for how long because he was taking medication during that time. He said that he lost a portion of his liver, several feet of his intestines, a portion of his upper colon, and one kidney. He stated that he required a colostomy bag from June until December, that he had two operations and a chronic infection, and that he suffered from chronic intestinal distress. He said that after his release from the hospital, he had difficulty finding work because of perceived sanitation issues with the colostomy bag, that he had to drop out of college, that he lived in a tent for a period of time, and that he eventually purchased a camper.

On cross-examination, the victim testified that he was smoking marijuana when Ms. Pursell arrived at the hotel, that they spent a couple of hours smoking crack cocaine, and that she brought the cocaine with her. The victim denied having supplied the money to buy the cocaine. The victim stated that he was also hoping to have sex with Ms. Pursell. He said that he was going to pay for more cocaine but that he wanted to ride along because "I'm not going to hand anybody my money and expect them to come back." He stated that generally, a person did not pay for drugs until the person saw the drugs and that people did not trust one another when drugs were involved. He said that they made several stops trying to procure cocaine and were unsuccessful. The victim agreed that Ms. Pursell seemed anxious to get more cocaine, that at one point, she left the hotel room to find more cocaine, and that when she returned, she asked for money. He agreed that he did not want to go to East Nashville and that Ms. Pursell left him on the side of the interstate about twenty minutes from the hotel. He said that he answered Ms. Pursell's telephone call because he was tired of walking. He noted that Ms. Pursell did not tell him anyone was in her car. He said that when Ms. Pursell arrived at the gas station, she asked if he had money for gas. He stated that Ms. Pursell did not have any money, that he had paid for gas several times when they were looking for drugs, and that he told her he had ten dollars, although he had more.

The victim testified that the man in the backseat of Ms. Pursell's car had "[j]ailhouse tattoos" and gang-related tattoos on his forearms and that the man appeared to be "high" and "spaced out." The victim denied that the police described the tattoos of various individuals to him. He said that no one talked in the car and that they listened to music. He stated that when he went to his truck at the hotel, he turned his back to the car in order to pull out cash from his pocket, remove thirty dollars, and return the remaining cash to his pocket. He agreed that Ms. Pursell knew he was carrying money because "that's how I got her to come to the motel room." He said that when he returned to the car, he was uncertain as to which man had the drugs, that the man in the backseat gestured for him to give the money to the man in the front seat, and that when he turned toward the front seat, he saw the gun.

-5-

The victim testified that when Ms. Pursell told him to give the shooter his money, he knew Ms. Pursell had told the man about the victim's money. The victim said that he intended to give the money to the man and "get the h--- out of the situation" but that he was shot. He said that he constantly relived that night and would never forget the car's license plate number. He agreed that he could not identify the Defendant as the shooter and said that he only saw half of the man's face. He stated that Ms. Pursell called the man "worm." The victim said that he believed Ms. Pursell told the men that he had money.

On redirect examination, the victim testified that his abdomen had a permanent hole as a result of the shooting, that he had no abdominal strength and suffered from back pain, that he formerly lifted weights and wrestled, and that he could no longer perform one sit-up. He stated that the police showed him blurry photographs of six African-American men with long hair. He said that he could not see any detail to the photographs and that he did not "even try to pick him out." He stated that the Defendant was the man who shot him and that he remembered "that smile and . . . that smirk when I looked in the [car] window." The victim recalled thinking that the Defendant was good-looking, that he was probably Ms. Pursell's "real boyfriend and I've been getting duped all along," and that the victim should be careful. The victim stated that he realized he was in a dangerous situation and did not want the Defendant to know he was carrying money.

On recross-examination, the victim testified that he remembered testifying at the preliminary hearing that he never saw the shooter's face. When asked whether seeing the Defendant at the preliminary hearing influenced his memory, the victim said that he never claimed to have seen details of the shooter's appearance. He said that he never "got a really good look" at the shooter's face, that the police photographs depicted men who could have been age forty or fifty, and that he remembered seeing a good-looking young African-American man smiling at him when he initially entered the car. The victim stated that he thought the men and Ms. Pursell were probably going to try to rob him and that as a result, he told Ms. Pursell that his money to purchase the drugs was at the hotel.

Metro Nashville Detective Russell Thompson testified that he responded to the scene of the shooting and reviewed the surveillance tapes with Mr. Patel. He said that the victim had been transported to the hospital by the time he arrived and that the victim had provided responding officers the name Meagan and the car's license plate number. Detective Thompson said that the police issued a news report based upon the license plate number, that Ms. Pursell's mother contacted them, and that the car was registered in Ms. Pursell's mother's name. Detective Thompson stated that he and crime scene investigators went to Ms. Pursell's mother's home, that they collected evidence from the

car, and that Officer Bill Kirby, who had since retired, collected fingerprints. Detective Thompson said that they recovered money in the parking lot at the hotel and nearby and that some of the money had been placed on an air conditioning unit.

Detective Thompson identified photographs of the victim's truck, the Ford Focus Ms. Pursell drove, and the hotel sidewalk. Detective Thompson said that a black jacket and a pack of cigarettes belonging to the victim were recovered from the sidewalk in front of the hotel. He stated that the jacket contained two bullet holes, one in the front and one in the back. He identified a photograph of a traffic citation issued to Ms. Pursell, which was found inside the Ford Focus.

Detective Thompson testified that no bullet holes were found in the car and that after reviewing the surveillance recording, he determined that the victim was shot while the car door was open. He said that that a bullet strike was visible on the pavement in the recording and that officers recovered a bullet from the outside wall of the hotel. He noted that the victim was shot "through and through." He identified photographs of the hotel wall where the bullet was located.

Detective Thompson testified that he saw crime scene investigators collect fingerprints from the car, that he had seen the process many times previously, and that the investigators dusted black powder on a surface and used tape to lift the powder from the surface. Detective Thompson stated that he was "by no means an expert in fingerprints," but that he had been a detective for ten years and had "done this a lot." He said that the investigators put the tape on index cards, wrote the location from where the fingerprint was collected, and wrote the complaint number on the card. He agreed that "all that goes into the evidence locker." He stated that he saw Officer Kirby "doing that."

Detective Thompson testified that twelve hours after the shooting, he went to the hospital and interviewed the victim. He stated that the interview was not recorded and that the victim was on medication. He said that the victim identified "Meagan" as the driver of the car and described the shooter consistently with the victim's trial testimony. Detective Thompson stated that he and another person interviewed Ms. Pursell and that as a result of that interview, he developed a photograph lineup and showed it to the victim. He said that the victim did not identify anyone from the photographs and that Ms. Pursell chose the Defendant's photograph and identified him as "Worm" and "Reggie." A copy of the marked photograph lineup, which contained a circle around the Defendant's photograph and Ms. Pursell's signature, was received as an exhibit.

Detective Thompson identified a twenty-dollar bill and a ten-dollar bill that were recovered next to a hotel room. He said that the money contained at least one stain but that the stain was not tested. He identified a five-dollar bill that was recovered next to another hotel room. Detective Thompson said that based upon information from Ms. Pursell, he went to the Defendant's cousin's house and that the gun used in the shooting was not found. He said that Ms. Pursell took the police to the Defendant's cousin's house and to the Defendant's house. He stated that he questioned Ms. Pursell about her being an accomplice to the robbery, that he "press[ed] her" about it, and that he could have been perceived as being "mean." He said, though, that Ms. Pursell did not admit any involvement in the robbery and that she cooperated with officers throughout the investigation. He stated that Ms. Pursell was never charged and that no evidence showed she was an accessory to the robbery.

On cross-examination, Detective Thompson testified that before Ms. Pursell's mother contacted the police, he searched for the car's registration based upon the license plate number provided by the victim. Although Detective Thompson did not remember the reason, he saw Ms. Pursell's mother's name but was unable to contact her. He said that Ms. Pursell's mother called the police on June 5, that she told them Ms. Pursell was not at home, and that the police instructed her to call back when Ms. Pursell returned. Detective Thompson said that after he reviewed the surveillance recording and saw the bullet strike, another detective returned to the scene to search for the bullet. Detective Thompson stated that during their first interview, he showed the victim a photograph lineup containing Ms. Pursell's photograph. He said that another detective showed the victim the photograph lineup containing the Defendant's photograph. Detective Thompson "assume[d]" that the photograph lineup shown to the victim was the same one shown to Ms. Pursell. He stated that photograph lineups were constructed using individuals with similar aspects to their appearances and that wearing dreadlocks and a short goatee was "fairly common[.]" He said that other photograph lineups were shown to the victim and Ms. Pursell.

Detective Thompson testified that he spoke to Ms. Pursell on the evening of June 6, and that after their interview he developed the Defendant as a suspect. Detective Thompson said that he obtained an arrest warrant for the Defendant on June 25, that he did not attempt to contact the Defendant personally, and that he spoke to the Defendant when he was arrested. Detective Thompson stated that twenty days passed before the warrant was issued and that he was on vacation for two weeks and was working on ten or twenty other cases during that time. He said that although another detective might conduct an interview in his stead, another detective would not obtain a warrant on his case if the charges were serious. He stated that he was familiar with conducting controlled telephone calls, that he tried to arrange a controlled call during Ms. Pursell's

interview, and that they could not reach the Defendant. He said that he did not feel comfortable obtaining an arrest warrant before June 25 due to "some information that . . . I don't know that I can talk about."

Detective Thompson testified that he wanted to speak with Delton Watkins, whom he believed was the man sitting in the car's backseat, that Mr. Watkins was arrested for an unrelated matter, and that Mr. Watkins did not identify the Defendant in a photograph lineup as someone he knew. Detective Thompson stated that a total of thirty-five dollars cash was recovered outside the hotel.

On redirect examination, Detective Thompson testified that at the time he interviewed the victim, he had not received the results of the fingerprint analysis. He stated that the victim was shown the photograph lineup containing the Defendant's photograph at a later date. He agreed that lineups contained similar-looking people in order to "give the lineup validity."

Meagan Pursell testified that she had known the Defendant for one month at the time of the shooting, and she identified the Defendant as the victim's shooter. She denied having had a romantic relationship with the Defendant. She agreed that she told the police the Defendant shot the victim and that she took the police "by the house where we dropped the gun off." She stated that either the Defendant or "the guy in the back" took the gun into the house and that she thought the house belonged to the Defendant's aunt. Ms. Pursell said that she also took the police to the Defendant's house and that she did not know if the Defendant was present. When asked whether she cared whether the Defendant knew that she had told the police where he lived, Ms. Pursell said, "I didn't want to put me and my family in harm[,] but I didn't know that anybody had a gun that day and I didn't know that anybody was going to get shot that day so I did what I had to do."

Ms. Pursell testified that she met the victim at her friend's house, that he was performing tattoo work there, and that she gave the victim her telephone number. She said that they had decided to "hang out" and that she was age twenty-one or twenty-two and did not make good decisions. She stated that at the time, she used drugs. She said that she met with the victim four or five times and that they stayed at hotels. She agreed that the last time, the victim was shot. She said that she met the victim at night, that they used drugs together, that both of them had "been up for a couple of days," and that they argued. She stated that they went to the Defendant's house to purchase drugs, that "it was taking too long," and that they left without having purchased drugs. She said they went to a house belonging to an acquaintance of the victim and purchased drugs.

Ms. Pursell testified that the victim was dissatisfied with the drugs, that they decided not to return to the hotel because the victim had sufficient cash with him, and that Ms. Pursell wanted to return to the Defendant's house, which was in East Nashville. She said that the victim did not want to go, that he pushed the steering wheel as she drove down the interstate, and that she threatened to call the police if he did not stop. She stated that the victim left the car and that she drove to the Defendant's house because it was close by, she felt shaken, and it was where they had discussed going. She said that she may have used drugs when she arrived at the Defendant's house.

Ms. Pursell testified that the victim called her and apologized, that he sounded sincere, and that he asked for a ride to the hotel and offered to pay for gasoline. She said that they talked for "a while" and that she eventually agreed to give him a ride. She stated that during her conversation with the victim, she was in her car and that the Defendant and another man stood in front of her car talking. She said that the victim was going to buy drugs from the men, that she and the men drove to a gas station to meet the victim, and that the victim put five dollars' worth of gasoline in her car. She stated that the Defendant sat in the front passenger seat, the second man sat in the rear driver's side seat, and the victim sat in the rear passenger-side seat.

Ms. Pursell testified that when they arrived at the hotel, the Defendant told the victim to "get what you want now" because he would not travel to the hotel again. She said that she parked the car, that the victim left the car, and that she thought he was going to retrieve thirty dollars from the hotel room, although she did not see where the victim went. She stated that the victim returned after a short time, that the back door was open and the victim stood outside the car, and that the Defendant pulled out a gun and demanded the victim's money. She said that the victim reached for the gun and "that is when it happened." She stated that she and the man in the backseat were "freaking out." She thought that she told the victim to give the Defendant his money. She said that she never saw any money and that after the victim was shot, she saw him go toward the hotel office.

Ms. Pursell testified that she was scared, that she backed out of the parking lot, and that she took "side streets" to drop off the gun at the Defendant's house. She said that inside the car, "[e]verybody was just screaming and cussing . . . it was a mess." She stated that she and the man in the backseat asked the Defendant why he shot the victim and that the man in the backseat "yelled out he was on parole and said, why would you do that?" She said she told the police that the Defendant responded that the victim was reaching for the Defendant's gun. She stated that both men discussed how to travel to their destination, that the men stated that the gun "needed to get out of the car," and that the Defendant gave her directions to a house. She said that she was crying and "trying to

drive." She thought that after they arrived, only the Defendant went into the house, but she was unsure. She said that after the Defendant returned, she dropped off both men at the Defendant's house and that the Defendant took a shell casing out of the car before he left. Ms. Pursell stated that the Defendant was happy he found the shell casing and that he later told her he flushed the shell casing down a toilet.

Ms. Pursell testified that she never saw how much cocaine the Defendant carried, that she saw an envelope made from brown paper, and that the paper was too small to hold two grams of cocaine. She stated that one-half gram of cocaine cost thirty dollars, that generally, a person looked at the cocaine inside an envelope during a drug transaction, and that she never saw the amount of cocaine inside the envelope. She said that when she, the victim, and the two men arrived at the hotel, the Defendant's telling the victim to buy as much cocaine as he could afford made her uncomfortable because she knew the Defendant did not bring a lot of cocaine with him. She stated that she "started getting the vibe or that uncomfortable feeling" the men were trying to cheat the victim and that she thought the victim also became uncomfortable. She denied that she had any indication the Defendant was going to shoot the victim. When asked why she did not call the police after the shooting, she said that she was young, that she had a two-year-old child, and that she was scared.

Ms. Pursell testified that she did not go home for one or two days because she did not want to tell her mother what had happened in her mother's car. Ms. Pursell said that she spoke to her mother, that she knew the police had come to her mother's house, and that when she returned home, she told her mother about the shooting. Ms. Pursell stated that she identified the Defendant in a photograph lineup as the person who shot the victim.

Ms. Pursell testified that the Defendant called her two days after the shooting, that the Defendant wanted her to meet him and discuss the shooting, and that she never met with him. She said that the Defendant told her to tell the police that another person shot the victim. After reviewing the video recording of her police interview, Ms. Pursell agreed she told the police that the Defendant told her to say the car was stolen. She stated that the man in the backseat was African-American, in his thirties, and had short hair.

On cross-examination, Ms. Pursell testified that she picked up the Defendant around 5:00 a.m. She did not remember why she went to the Defendant's house, although she said that they had been communicating throughout the night and that she had been trying to obtain drugs. She remembered calling the Defendant after the victim left her car around 4:45 a.m. and asking the Defendant if he had drugs and if it was okay

-11-

to come to his house. She did not remember the location from which she picked up the victim. She said that she and the victim used "rock cocaine" at his hotel room. She stated that she went to the hotel room to get high, that she considered the victim a friend, and that the victim "offered to get me high and was trying to have sex with me." She denied intending to have sex with the victim. She said that the victim paid for the cocaine and that if she had money, she would have supplied it.

Ms. Pursell testified that she and the victim spent an hour in the hotel room, that they ran out of cocaine and left to buy more, that they bought cocaine from the victim's friend, and that Ms. Pursell had "a couple of hits." She said that the victim was "served small" and that he was in a bad mood. She stated that they argued because he wanted to return to the hotel before buying more cocaine and that this plan did not make sense to her. She said that he tried to turn her steering wheel while they were on the interstate, that she threatened to call the police, and that he chose to get out of the car.

Ms. Pursell testified that after about one and one-half hours, she picked up the victim because she felt bad. She said that she and the victim had been talking on the telephone for about one hour and that he had apologized. She stated that the victim bought her five dollars' worth of gasoline and that he told her he would buy her more later "but that is what he had on him." She said that she and the victim were going to "chill" together. When asked whether she supplied transportation to the shooter and brought the victim to the hotel, Ms. Pursell responded, "If you mean I was in the wrong place at the wrong time, yes. I'm guilty of giving a friend a ride, yeah." She agreed that she was there to use cocaine and that she did not have any money other than five dollars, although she "didn't need it."

Ms. Pursell testified that after she dropped off the men, she went to a fast food restaurant in East Nashville, that the Defendant had given her 100 pennies, that she bought a burrito, and that she drove to Hendersonville. She agreed that the victim bought her gasoline at 5:00 a.m. and said that she did not notice whether her low gas light was on after the shooting. She said later, though, that she arrived at the Defendant's house at 4:45 a.m., that she spent an hour there, and that she picked up the victim at the gas station at about 6:50 a.m. She stated that she had been awake for one and one-half days, that she had been smoking crack cocaine for two or three days, and that she smoked crack cocaine daily at the time. She said that she had since stopped using cocaine, that she had a baby, and that she took anxiety medication and an antidepressant prescribed by her doctor. When asked whether she was intoxicated at the time of the shooting, Ms. Pursell said that she was "pretty sober" and that she would not have shot somebody. She stated that she was tired, that cocaine produced a "quick high" that dissipated rapidly, and that "we weren't on drugs and decided to do something stupid, that is not what happened here."

-12-

Ms. Pursell said that she thought the robbery had been planned and that the Defendant was scared when the victim reached for the gun. She did not think the Defendant smoked crack cocaine, although he may have used powder cocaine.

Ms. Pursell testified that she pleaded guilty to "petty theft" on two occasions in 2008. She said that when she was at the Defendant's house, he may have "had a dollar with a little bit" of cocaine in it. She denied trading sex for cocaine at the Defendant's house and said she had never been charged or pleaded guilty to prostitution.

Metro Nashville Police Department Forensic Scientist Linda Wilson, an expert in latent fingerprint examination, testified that she received a "latent envelope" from Officers Kirby and Lawrence. She identified fingerprint cards as the ones she examined, and the cards were received as an exhibit. She stated that she matched some of the fingerprints to the Defendant's fingerprints.

On cross-examination, Ms. Wilson stated that out of sixteen cards, the prints on two cards matched the Defendant. She noted that the envelope from Officer Kirby contained ten cards and that the envelope from Officer Lawrence contained six cards. She said that the Defendant was listed first in possible matches generated by the Automated Fingerprint Identification System (AFIS). She stated that according to notations on the fingerprint cards, the prints were collected from the exterior front passenger door and the "front passenger exterior." She said that other fingerprints matched Delton Watkins and that Mr. Watkins was the first possible match listed by AFIS for those fingerprint cards. She stated that in order to consider a latent fingerprint "of value," the print had to have eight visible "minutia points" to compare to fingerprints in the AFIS system. She noted that her supervisor, Julia Hooper, verified her results as a safeguard.

On redirect examination, Ms. Wilson testified that Mr. Watkins' fingerprints were collected from the rear passenger door, the driver's doorframe above the window, and the driver's side inside hood.

The envelope of ten fingerprint cards submitted by Officer Kirby was received as an exhibit. The front of the envelope reflected the following notations:

Date: 6-6-12  Time: 0710 Precinct: Madison
. . .
Complaint No. 12-0474756
Lifted By: Kirby T.I.S. 218498
Handwritten notation: Delton L. Watkins OCA 151764 LW 6-11-12

-13-

Reginald B. Coffee OCA 374416 LW 6-11-12

The back of the envelope read:

Supervisor Latent Receipt
Supervisor approving:  J Nicholson  ENO # 226502
Date: 6-6-12  Time: 1530  # Cards: 10
Received in Latents by: A Stewart  ENO #266928
Date: 6/7/12 Time: 0530 # Cards: 10[1]
Assigned to: L Wilson
Received by: Wilson ENO # 268128 6-7-12

The cards inside were numbered in red ink, were labeled complaint 12-0474756 in black ink, and contained the location, date, and time each print was lifted.  Cards two and three, marked, "front pass. exterior" and "re-lift exterior front pass. door," contained handwritten notations which included the Defendant's OCA number and Ms. Wilson's initials.  Cards six, eight, and nine contained Mr. Watkins's OCA number.  The cards were also initialed and dated by another person, but the initials were illegible.

Upon this evidence, the Defendant was convicted as charged and sentenced to fifteen years.  This appeal followed.

# I

### Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction relative to identity.  He argues that Ms. Pursell was an accomplice whose testimony regarding the identity of the shooter was inadequately corroborated in the absence of the fingerprint evidence.  The Defendant does not contest the sufficiency of the evidence relative to the elements of the offense.  The State responds that Defendant raises this issue on improper grounds, Tennessee Rule of Criminal Procedure 33(d), and that alternatively, the jury, by its verdict, found that Ms. Pursell was not an accomplice and that no corroboration was necessary.

As a preliminary matter, the Defendant's statement of the issue is, "The verdict of the jury was against the weight of the evidence."  The Defendant argues that the trial

---

[1] The number ten is written in a pen that does not appear to match the rest of the writing, and an unintelligible number appears underneath.

court erred by affirming the jury's verdict as the thirteenth juror. Tennessee Rule of Criminal Procedure 33(d) provides, in pertinent part, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence."

> Trial judges exercising their thirteenth juror function are acting as jurors. "[T]he trial judge and the jury see the witnesses face to face, hear their testimony, and observe their demeanor on the stand." *Bolin v. State,* 405 S.W.2d [768, 771 (Tenn. 1966)]. Thus, proper factors to be weighed by the trial court include the witness' testimony, demeanor, and credibility, all factors likewise considered by the jury. *See State v. Burlison,* 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). The rule calls upon the trial judge to exercise its role in its traditional capacity.

*State v. Dankworth*, 919 S.W.2d 52, 58 (Tenn. Crim. App. 1995). An appellate court, however, may not function as a thirteenth juror. *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). The Rules of Appellate Procedure limit the role of an appellate court relative to findings of guilt in criminal cases to the question of whether the evidence "is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." T.R.A.P. 13(e). In that vein, the Rules prescribe that "relief may not be granted in contravention of the province of the trier of fact." T.R.A.P. 36(a). After a trial court has discharged its obligation as thirteenth juror and approved the verdict, appellate review requires "accrediting of the testimony of the witnesses for the state and the resolution of evidentiary conflicts in favor of the state." *Burlison*, 868 S.W.2d at 719 (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). For these reasons, our review of the Defendant's issue is limited to the question of whether the evidence is sufficient to support the conviction.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Especially aggravated robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear" which is "[a]ccomplished with a deadly weapon" and in which "the victim suffers serious bodily injury." *Id.* §§ 39-13-401(a) (2014), -403(a)(1)-(2) (2014).

"An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). "[A] conviction may not be based solely upon the uncorroborated testimony of an accomplice." *See, e.g.*, *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886 (Tenn. 2013). In order for accomplice testimony to be adequately corroborated:

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bigbee*, 885 S.W.2d at 803 (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (citations omitted)); *see Shaw*, 37 S.W.3d at 903.

Regarding the question of whether a person is an accomplice,

> The term "accomplice" does not include a person who has guilty knowledge, or is morally delinquent, or who was even an admitted

-16-

participant in a related but distinct offense. To constitute one an accomplice, he must perform some act or take some part in the commission of the crime or owe some duty to the person in danger that makes incumbent on him to prevent its commission. An accomplice is "one culpably implicated in, or who unlawfully co-operates, aids, abets, or assists in, the commission of the crime charged."

The generally accepted test as to whether a witness is an accomplice is whether he himself could have been convicted for the offense, either as principal or accessory.

*Pennington v. State*, 478 S.W.2d 892, 898 (Tenn. Crim. App. 1971) (quoting 2 *Wharton's Criminal Evidence* § 448 (12th ed. 1955)). A person is not deemed an accomplice simply because he or she was present at the crime scene. *Letner v. State*, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974); *Hicks v. State*, 149 S.W. 1055, 1056 (Tenn. 1912).

At the trial, Detective Thompson testified that he questioned Ms. Pursell about her involvement in the shooting, that sufficient evidence did not exist to charge her as an accessory, and that Ms. Pursell cooperated with the police during the investigation. The victim testified that although he initially suspected Ms. Pursell had played a role in the shooting, by the time of the trial, he did not believe she was involved in planning the robbery, only that she had disclosed that the victim was carrying a sum of money with which he could pay for drugs. We note that the victim's initial suspicion is not evidence Ms. Pursell was an accessory. The victim stated that Ms. Pursell looked shocked when the Defendant produced a gun, that she "freaked out," and that she seemed genuinely concerned for the victim's condition during his recovery. Ms. Pursell testified that she had no knowledge of the Defendant's intent to rob the victim and that the Defendant's actions took her by surprise. By the Defendant's request, the court gave an accomplice instruction to the jury.

In the light most favorable to the State, the evidence established that Ms. Pursell was not an accomplice. No evidence suggested Ms. Pursell knew the Defendant carried a gun or was planning a robbery when she drove the men to pick up the victim. As a result, her testimony regarding the Defendant's identity did not require corroboration, and the evidence is sufficient to support the conviction. The Defendant is not entitled to relief on this basis.

## II

### Fingerprint Evidence

The Defendant contends that fingerprint evidence collected from Ms. Pursell's car was improperly admitted, arguing that because the officers who collected the fingerprints did not testify, the chain of custody was incomplete. The State responds that the chain of custody was adequately proven.

As a preliminary matter, we note that the trial court did not comment before overruling the Defendant's chain of custody objection. The prosecutor argued that fingerprint cards were not "a chain of custody issue per se, this is not cocaine or a substance that can be changed or tampered with." On appeal, the State argues that Officer Kirby did not have the requisite knowledge to alter the fingerprint cards before Ms. Wilson analyzed them. Officer Kirby did not testify, and therefore we cannot presume he did not have the ability to alter the fingerprints. Although it might be difficult to alter fingerprint cards, we think that the State must prove the chain of custody for *all* tangible evidence, not only certain varieties.

In addition, the prosecutor argued at the motion for a new trial that the Defendant's chain of custody issue was "actually [an] appellate issue[]" and that "the way that the fingerprint was introduced is a matter to be appealed, that is not really a matter for a Motion For New Trial . . . this is not the forum for that complaint." The prosecutor's argument is misplaced at best, and in any event, we disagree. Including the chain of custody issue in the motion for a new trial was necessary to preserve the issue on appeal. Tennessee Rule of Appellate Procedure 3(e) states, "[No] issue presented for review shall be predicated upon error in the admission . . . of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Trial counsel properly included this issue in the motion for a new trial.

Tennessee Rule of Evidence 901 states that evidence must be authenticated in order to be admissible. Evidence is authenticated by providing proof "sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). "[W]hen the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence," it should be admitted. *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008). In order to prove the reliability of tangible evidence, the State must prove "an unbroken chain of custody." *State v. Scott*, 33 S.W.3d 746, 760 (internal citation omitted).

Relative to the State's burden in proving the chain of custody, our supreme court has stated the following:

> Even though each link in the chain of custody should be sufficiently established, this rule does not require that the identity of tangible evidence be proven beyond the possibility of all doubt; nor should the State be required to establish facts which exclude every possibility of tampering . . . . An item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item . . . . [If] the State fails to offer sufficient proof of the chain of custody, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." *Scott*, 33 S.W.3d at 760 (quoting Cohen, et al., *Tennessee Law of Evidence* § 901.12, at 624 (3rd ed. 1995)).

*Cannon*, 254 S.W.3d at 296. This court reviews chain of custody determinations for an abuse of discretion. *Id*. at 295.

Three Tennessee cases are instructive. In *Cannon*, the defendant objected to the admission of DNA evidence obtained from a pair of pantyhose, arguing that the chain of custody for the pantyhose had not been established. *Id*. at 295-96. The testimony reflected that the victim arrived at the hospital and had changed out of her clothing before a forensic examiner, an emergency room doctor, and a detective arrived. The forensic examiner initially testified that she knew the pantyhose belonged to the victim because they were located with the victim's other clothing and because no one else had been in the room. The emergency room doctor who treated the victim testified that the hospital's general protocol for the storage of the personal effects of sexual assault victims included placing clothing in a bag, and he stated that he did not see what the victim wore when she arrived or whether protocol had been followed relative to her clothing. In violation of the rule of sequestration, the examiner was present in the courtroom during the doctor's testimony. When the examiner was recalled by the State, she testified that she had seen a bag of the victim's clothing in the hospital room, that a detective removed the clothing from the bag in order to photograph it, and that the pantyhose were included in the bag. However, the detective could not remember whether a pair of pantyhose was inside the bag, and he testified that he and the victim had discussed a pair of underwear, not pantyhose. Additionally, photographs of the victim's clothing did not show a pair of pantyhose, and the pantyhose were not mentioned in the examiner's and the detective's reports. *Id*. at 296-98.

Our supreme court determined that the pantyhose and, by extension, the DNA analysis were improperly admitted because of the "suspect nature of the identification of the pantyhose[.]" *Id*. at 298. The court noted the conflicting witness testimony, the inconsistency between the forensic examiner's statements and the photograph exhibits, and the fact that the examiner only testified about the victim's clothing being in a bag after improperly hearing the emergency doctor's testimony. The court concluded that the error was not harmless because the DNA analysis was "the *only* tangible evidence linking Defendant in any way" to the victim, and it noted that the victim and others had previously identified another person as the attacker. *Id*. at 299.

Likewise, in *Scott*, the police department sent an envelope containing three hairs to the Federal Bureau of Investigation (FBI) for testing. When the FBI returned the hairs, they had been mounted on a microscopic slide. 33 S.W.3d at 760. Our supreme court held that in the absence of testimony about how the hairs had been processed by the FBI and verification that the hairs received from the FBI were the same as the ones sent to it, the chain of custody was not complete, and the trial court erred by admitting the evidence.[2] The court noted the sensitive nature of mitochondrial DNA testing and the danger that contamination of a sample would alter the results of the test. *Id*. at 761.

Conversely, this court concluded in *State v. Dean*, 76 S.W.3d 352 (Tenn. Crim. App. 2001), that although the person who drew a blood sample from the defendant did not testify, the chain of custody was adequately proven. In that case, a police sergeant testified that he observed a sexual assault resource center employee draw the defendant's blood, take the defendant's photograph and thumbprint, and place a label on the vial. Another resource center employee testified about the standard procedure used when collecting blood samples from suspects, and she identified the signature of the person who drew the defendant's blood, with whom she was acquainted. The person who received the blood sample at the resource center and transported the blood sample to the Tennessee Bureau of Investigation (TBI) did not testify, although he was identified by his signature on the center's records and by the TBI laboratory technician. *Id*. at 366-67.

This court distinguished the *Dean* case from *Scott*, noting that "[a]lthough the defendant stressed at trial and on appeal possibilities of tampering and contamination, there was no showing that this occurred. Rather, the State presented minimal but adequate 'proof that the evidence was handled according to normal procedures and that there [was] no indicia of tampering.'" *Id*. at 370 (quoting Neil P. Cohen et al., *Tennessee Law of Evidence*, § 901[13][f] (4th ed. 2000)); *see State v. Freddie Lee Johnson*, No

---

[2] Because our supreme court reversed the conviction on other grounds, it did not reach the issue of whether the error was harmless.

M2014-01494-CCA-R3-CD, 2015 WL 5310910, at *14-17 (Tenn. Crim. App. Sept. 10, 2015). This court concluded that the chain of custody had been properly proven.

In this case, Detective Thompson testified that he observed Officers Kirby and Lawrence collect fingerprints, and he described the process of fingerprint collection, including labeling the individual cards with the case number. Although Detective Thompson agreed that "all that goes into the evidence locker," he did not describe the procedure by which evidence was logged at the police station or who had access to the evidence locker. Although Ms. Wilson testified that she received an envelope of fingerprint cards from Officers Kirby and Lawrence, the envelope that was received as an exhibit reflects that a supervisor, "J Nicholson," signed the envelope and that "A Stewart" first received the envelope in the latent fingerprint division before the case was assigned to Ms. Wilson. No testimony established the identity of J. Nicholson or A. Stewart or their job titles, and Ms. Wilson identified Julia Hooper as her supervisor. According to written notations on the envelope, the fingerprints were collected on June 6, 2012, at 7:10 a.m., J Nicholson counted them at 3:30 p.m. the same day, and they were received in the latent fingerprint facility on June 7, 2012, at 5:30 a.m. No testimony established where the fingerprint cards were located during the interim period or that the envelope was properly sealed when Ms. Wilson received it for testing. The envelope itself had been taped and opened multiple times such that it was impossible to tell the condition of the envelope at the time of testing. In addition, the envelope was split open on one side,[3] showed multiple sets of initials, and the cards inside were initialed by Ms. Wilson and another person, whose initials were illegible but, based upon Ms. Wilson's testimony, could have been Ms. Hooper.[4] However, Ms. Wilson also testified that the case number written on the envelope and the cards matched the relevant case number.

A gap in the chain of custody exists; in contrast to *Cannon*, *Scott*, and *Dean*, no standard procedures for storing evidence were described at the trial, except for the assignment of a case number and a general agreement with the statement "all that goes into the evidence locker." Between the time Officer Kirby left Ms. Pursell's car and the time A. Stewart received the envelope in the latent fingerprint division, no proof was presented of what was done with the envelope. For example, a log from the evidence locker was not introduced as an exhibit, and the present evidence custodian did not testify about who had access to the locker or what the log book showed for the dates in question. Ms. Wilson did not testify about the condition of the envelope when she received it, whether it was properly sealed, or the latent fingerprint division's standard procedure for

---

[3] It is possible the envelope was cut down the side at the trial, but the transcript does not reflect it.

[4] Ms. Wilson's testimony indicated that Ms. Hooper would have initialed the cards.

-21-

storing and testing fingerprint evidence. In addition, although the fingerprint envelope reflects that "J Nicholson" counted ten cards at 3:30 p.m. on June 6, no evidence established how many cards Officer Kirby collected at the scene. We note that relative to the number of cards A. Stewart counted, the number ten had been written over another, illegible number and was with a different thickness of pen than any other writing on the envelope.

Unlike *Cannon* and *Scott*, there has been no allegation, and the record does not reflect, that any tangible change in the fingerprint evidence occurred or any indication existed that the cards were altered or substituted. However, as in *Scott*, the absence of testimony about standard procedures for handling, storing, and transporting fingerprint evidence makes it "impossible to know whether anyone tampered with the evidence, or whether anyone had the opportunity to 'confuse, misplace, damage, substitute, lose, [or] replace'" the fingerprint cards. *Scott*, 33 S.W.3d at 761 (internal citation omitted). We conclude that the chain of custody was not sufficiently proven and that, as a result, the fingerprint evidence was erroneously admitted. However, as we concluded above, the error was harmless because the evidence was sufficient to convict the Defendant without consideration of the fingerprint evidence. The Defendant is not entitled to relief on this basis.

Based on the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE